UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LINDA TAYLOR | § | CIVIL ACTION NO. |
| Plaintiff | § | 4:12-CV-01975 |
| | § | |
| | § | |
| Vs. | § | |
| | § | |
| TEXAS SOUTHERN UNIVERSITY | § | |
| Defendant | § | |

A JURY IS DEMANDED

### Plaintiff's First Amended Compliant

Linda Taylor took her responsibilities at Texas Southern University's College of Education as College Business Administrator II seriously. Among her duties as an Administrator was the monitoring of other employees. When she discovered that employees were accepting money illegally, either in the form of falsified time slips or the receipt of scholarship money to which they were not entitled, she dutifully, and with the utmost concern for her ethical responsibilities, sounded the alarm. What she received in return for the loyal performance of her duties was a demotion, a hostile environment, and relocation of her work to a place detrimental to her physical and emotional health; all designed to assure that she would leave her employment with Texas Southern University. She was terminated from her employment with Texas Southern University in June of 2012. Texas Southern University didn't seem to care about retaliation; they didn't even post the required posters advising employees of their rights!

### Parties

1. The plaintiff, Linda Taylor, hereinafter, "Taylor", is an individual who resides in

Missouri City, Fort Bend County, Texas.

2. The defendant, Texas Southern University, hereinafter "the University", is a Public university located in Houston, Harris County, Texas. Defendant may be served by serving its President, Dr. John Rudley, at 3100 Cleburne Street, Hannah Hall, Suite 220; Houston, Texas 77004.

## Jurisdiction

3. This case is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. and the Texas Labor Code § 21.055 and Texas Government Code § 554. This court has jurisdiction of this case according to 28 U. S. C. § 1331 and 28 U. S. C. § 1343.

4. This case is also brought under the WHISTLEBLOWER ACT – Texas Government Code §554.003 and any applicable federal acts that may be discovered later.

5. This case is also brought under the Texas Commission on Human Rights Act ("TCHRA") found at Chapter 21, Employment Discrimination, in the Labor Code of the Revised Statutes of Texas.

6. This case is also brought under the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq*.

7. Venue is invoked pursuant to 28 U. S. C. § 1391 and 28 U.S.C. 1367.

## STATEMENT OF PLAINTIFF'S CASE

## ADMINISTRATIVE PREREQUISTIE COMPLIANCE

8. Taylor brings this lawsuit under the Texas Commission on Human Rights Act

2

("TCHRA") found at Chapter 21, Employment Discrimination, in the Labor Code of the Revised Statutes of Texas. Taylor contends she suffered discrimination based on retaliation, racial discrimination, gender discrimination, and age discrimination.

9. Taylor filed a charge with the Texas Commission of Human Rights aka Texas Workforce Commission through filing a complaint with the EEOC within 180 days of the last alleged act of discrimination. The University is an employer and Taylor was an employee within the meaning of the TCHRA. Taylor has exhausted her administrative remedy under TCHRA. The Equal Employment Commission issued Taylor a right to sue letter. This lawsuit was filed within 90 days of her receipt of a "right to sue" letter from the U.S. Department of Justice.

## FACTS

10. Taylor is a 53 year old light-skinned black female. She holds a Bachelor's Degree and a Master's Degree from accredited universities.

11. Taylor began her career at the University on or about February 9, 1999, as an Administrative Assistant in the Department of Educational Leadership and Foundation within the College of Education.

12. On or about 2002 Taylor was promoted to Office Manager in the Dean's office.

13. Two years later, on or about 2004, Taylor was promoted to Executive Assistant to the Dean.

14. Taylor was promoted to a newly formed position, as College Business Administrator II by the University, on or about July of 2010. During Taylor's time as the Executive Assistant to Dean Cummings, part of Taylor's duties included the monitoring of "Time and Effort Reports,"

3

(hereinafter referred to as "timesheets") for the entire administrative staff, including twelve-month administrators.  On or about November of 2010, the former Dean Cummings and the CBA trainer, Ms. Marli Bober, advised Taylor that her new job duties, as the CBA (College Business Administrator) not only included the monitoring of time sheets, but  Taylor was to begin to have more authority in terms accountability of reporting of time.  At that time, the Deans of the Colleges delegated authority and accountability and responsibility to the CBAs of each college.

    15. During a CBA (College Business Administrator) training session, during 2010, President John Rudley addressed the CBA team regarding faculty members who were on TSU payroll while teaching at the same time, at Houston Community College (HCC) and other places. President Rudley stated he was aware that these employees were not coming to work as required. The President warned that these wrongdoings would not be tolerated.  Taylor, as a CBA responsible for the reporting of these types of wrongdoings, took President Rudley's statement seriously and was determined to act according to what Taylor perceived as a mandate from the President, himself. President Rudley made it clear the CBA's were **accountable** for accurately reporting time.

    16. In the course of performing her job duties, Taylor became aware of major problems related to time reporting by employees of the University as well as the wrongful payment of money from various sources to employees of the University.

    17. She noticed discrepancies in the reporting of time by employees, i.e. attempts by employees to falsify timesheets.  Seriously believing that she was accountable and responsible, Taylor refused to sign off on timesheets that were inaccurate.  Taylor first reported these incidents regarding the stealing of time, to Dean Cummings.  When no action was taken,

4

Taylor, still believing the accountability to be a part of her job duties, reported the problem to the Board of Regents for the University, on or about early Fall 2010.

18. Taylor also noticed discrepancies in that employees were collecting scholarship payments, even though they were ineligible for those scholarship funds. In some cases employees were paid as employees when they were receiving academic credits, and in some cases money from scholarship programs and foundations, for attending classes <u>all at the same time they were supposed to be at their work location working</u>. At least one employee received several degrees while working full time for the university, without proper prerequisites, just by registering herself using the "Banner" system. In other cases, faculty members were "attending" classes at the same time they were "teaching" another class at the University.

19. Taylor first reported these discrepancies to Dean Cummings on or about March 2010. Then, Taylor reported these issues to Interim Dean Davis later that same month. Subsequent to that, as part of her then new CBA job duties, Taylor reported these discrepancies to the Board of Regents, including, but not limited to: Provost Ohia, President Rudley, most of the Deans of the Colleges for the University and Brian Dickens from Human Resources, on or about August 19, 2010. Prior to this August 19, 2010 meeting, Taylor mailed copies of supporting documents to each member of the Board of Regents. Taylor reported on these same offenses, most of which were continuing, a second time to the Board of Regents, in the October 21, 2010.

20. As is the custom at the University, once Taylor became CBA and became responsible for the accuracy of the timesheets, and subsequently notified her direct superiors and later the Board of Regents of those discrepancies, Taylor's work environment became hostile. The hostility started with Taylor receiving harassing and abusive emails. During department meetings Taylor had to endure verbal abuse including being referred to with pejorative terms like the "devil", an "adulterer", and a "pathological liar." She was accused of stealing a

5

computer when the computer disappeared from an office for which she and others had access. (The computer was later found and appeared to have been hidden on purpose.) The abuse occurred on a regular daily basis, even outside of meetings. Other employees came to Taylor and informed her of the hostile, disparaging, and condemning accusations persons in powerful positions at the University were making against Taylor. One such employee taped an example of these derogatory remarks and played the tape for Taylor. She found out that the University had made an inquiry into her credit records without her permission or knowledge and then proceeded to publicize their opinion of what they found.

21. The hostile work environment and the retaliations for her disclosures of the discrepancies contributed to serious health issues for Taylor requiring hospitalization. She requested and was approved for Family Medical leave, took off the time recommended by her physician(s), and returned in August of 2010.

22. The harassment even continued while Taylor was off on leave having surgery. On or about May 2010, when Taylor returned from FMLA leave, one employee informed Taylor that while Taylor was in the hospital for surgery, Dean Poats attempted to set Taylor up for embezzlement. Early in 2010, an internal auditor, Ron Cornelius, for the University came to see Taylor. Mr. Cornelius informed Taylor that he was auditing Taylor's books because of accusations made regarding funds. Mr. Cornelius became suspicious of the accusations when, according to him, Dean Poats requested that Mr. Cornelius not tell Taylor that an audit was being conducted. Taylor had to assist Mr. Cornelius in finding the documents he needed for his investigation, as the documents had been moved from Taylor's prior office in the Department of Education's Dean's office, to a secondary location. After they moved the files to a secondary location while Ms. Taylor was out on medical leave, the files were very much in disarray. Taylor has requested an external audit and a copy of the internal audit report on many numerous

6

occasions since that time period. No audit report, internal or external, has ever been given to Taylor. Obviously, though, they found no wrong-doing on the part of Taylor.

23. In another example of hostility and harassment Taylor was falsely accused on several occasions of incompetence in her job performance. Twelve-month administrators/department chairs were purposely not turning in required paperwork to Taylor, with regards to new employees they hired, by the University's required deadline. Consequently, Taylor, as the administrator responsible for the approval of said employees' funding, accuracy the paperwork, and processing of said paperwork, was unable to perform her job duties. Basically, these new hires were hired and allowed to start working before they filled out any employment paperwork. This was done by those responsible for securing that paperwork in a malicious and conspired attempt to have it appear that Taylor was not efficiently performing her job duties. Taylor was made aware of these individuals' conspiracy by other persons who were in attendance at a meeting in which the topic of discussion was how to find a way to discredit Taylor. Taylor reported this harassment to Dean Cummings and Associate Dean James Johnson. Both Deans and Taylor discussed this issue identifying it as an attempt to disparage and discredit Taylor. No improvements occurred and the harassment and hostility continued.

24. The hostile work environment and the retaliations for her disclosures, the individualized surveillance, enhanced scrutiny, and constant harassments of the discrepancies contributed to serious health issues for Taylor eventually requiring her hospitalization. She requested and was approved for Family Medical leave from May 7, 2011 through August 10, 2011.

25. Instead of taking action to remedy the discrepancies Taylor had been reporting, on or about April 11, 2011, Taylor was demoted from CBA of the College of Education, to Administrative Assistant in the Health and Kinesiology Department by Dean Poats. As a

result, reports of the abuse of federal and state funds, by fraud, stopped being reported. On or about May 2011, Taylor took FMLA leave for 12 weeks. On August 16, 2011, Taylor received an official letter from Dean Poats notifying Taylor that, effective September 1, 2012, Taylor was demoted permanently and that her pay was reduced by 27.1 %, from $53,500.00 to $39,000.00.

26. Taylor's physical work area was moved to the gymnasium, a building known by everyone to have environmental issues including, but not limited to: mold and toxic gases. The University was aware of these issues, as the minutes from a Health and Kinesiology departmental April 4, 2012 meeting indicate. During the meeting, a faculty member complained of the mold issues in the gymnasium for the last 10 years. Dr. Horton ran said meeting, and was therefore not only aware of the environmental triggers. To add insult to injury, Dr. Horton assigned Taylor the responsibility of "taking care of it," without any direction or funding to take care of said issues. She was well aware of the fact that Taylor had allergies to the mold and other environmental issues. Shortly, after Taylor's demotion, it was discovered that Taylor had been inadvertently demoted down two pay levels. This was rectified within the first month of Taylor's initial demotion, and Taylor was moved up one level to the position of Sr. Administrative Assistant. However, Taylor's job description and placement in the environmentally unsafe area, and where she was harassed on a daily basis, stayed the same.

27. Taylor never had a chance of surviving the harassment once Dean Poats became the Interim Dean, and later, the Dean of the College of Education. Dean Poats was one of the staff members that Taylor had previously reported to the Board of Regents for stealing time. On or about April 11, 2011, Ms. Poats became Interim Dean Poats and moved into Dean Cummings office, replacing him. Mid-day, Dean Poats' office sent an email requesting 12 other employees whom Taylor had written-up in the past for various wrongdoings requesting sabotage evidence against Taylor. Later that day, Taylor, as the CBA for the Dean, entered what was now Dean

Poats' office to see if there was anything the new Dean needed.   Taylor was told by Dean Poats, that Dean Poats needed to talk to Taylor, but did not have time right then to do so. Instead, Dean Poats immediately handed Taylor a reassignment and demotion letter, stating it had become difficult for Dean Poats to function with concerns about Taylor "looming" in the College of Education.

28. Instead of taking action to remedy the discrepancies she reported, on or about April 11, 2011 Taylor was demoted and moved to an office in the gymnasium, a building known by the University to have mold and toxic gases.

29. The University quickly moved Taylor's work documents, files and personal belongings without allowing her the opportunity to pack them up, causing sensitive documents to be exposed to unnamed individuals.   Taylor never had an opportunity to retrieve all of those files.

30. Once Taylor was demoted and moved from her position, the position was filled with a young dark-skinned black man with less educational credentials as Taylor.   Taylor's replacement, however, had little or no experience, yet was paid substantially more than Taylor was paid.

31. On or about April 15, 2011, Taylor filed her first grievance regarding Dean Poats, with the University.   The University responded by closing the grievance stating there was no merit to the grievance by sending an email to Taylor, while Taylor was on FMLA leave. Taylor did not receive the University response until August 2011.   Taylor requested the grievance be reopened.   This grievance was finally closed on November 1, 2011 in a letter stating there was no merit; even though Ms. Sinclair, the HR Generalist never interviewed the only witness Taylor requested Ms. Sinclair to interview.

32. In a discriminatory fashion, in late April 2011, Taylor was denied the procedural

University custom of having a transitional meeting, which should have included the CBA, Taylor, and the outgoing and incoming Deans. This meeting should have included an assessment by the incoming Dean of the CBA to discern whether or not the CBA should retain said position. Taylor was told by Dean Cummings he asked Dean Poats about having such a meeting, but Dean Poats refused to meet.

33. Taylor was damaged physically by being placed in a hostile work environment and made to suffer retaliatory acts against her for Taylor's disclosures of the wrongdoings by other employees of the University. These retaliatory acts perpetrated against Taylor aggravated health issues until they became severe and serious enough to require Taylor to undergo surgery that required hospitalization. Consequently, Taylor had to request and was approved for Family Medical leave from May 7, 2011 through August 10, 2011.

34. On or about August 22, 2011, upon receiving a letter from the University indicating that she was permanently demoted, Taylor filed a claim with the EEOC. The University filed an answer with the EEOC on October 12, 2011. On or about January, 2012, the EEOC notified Taylor that the case had been turned over to the U.S. Department of Justice. On March 30, 2012, Taylor was sent a Right to Sue letter.

35. On or about September 23, 2011, Taylor filed her second grievance with the University. This grievance was also administratively closed on November 1, 2011.

36. On or about October 2011, Taylor filed her third grievance with the University. This grievance was never closed, nor was Taylor ever notified of a status on this grievance. That grievance was never closed, nor was Taylor ever notified of a status on it.

37. On November 2, 2011, Taylor filed an Amended Complaint with the EEOC.

38. On or about November 7, 2011, Interim Dean Poats became Dean Poats.

39. On or about March 19, 2012, Taylor filed her fourth grievance.   Taylor has not been advised as to the status of this grievance.

40. On April 2, 2012, Taylor received a "right to sue" letter from the U.S. Department of Justice.

41. Taylor was wrongfully terminated in June of 2012.

42. Taylor filed suit in the United States District Court on June 29, 2012.

## CAUSES OF ACTION

### RACE DISCRIMINATION AND RETALIATION

43. The defendant's conduct violates Title VII of the Civil Rights Act of 1964, which Prohibits discrimination in employment on the basis of age, wage, gender or race.   It also violates Title VII's prohibition against a person who complains of mistreatment.

44. The defendant's conduct violates the prohibition of discrimination pursuant to the Texas Commission on Human Rights Act, Chapter 21.001 *et seq*.

45. The plaintiff timely filed a charge of discrimination to challenge the age, wage, gender, and race discrimination she suffered.   She has received a right to sue letter on these charges and timely files this lawsuit to vindicate her rights.

### FAMILY MEDICAL LEAVE ACT

46. Within two weeks of Taylor returning to work after University approved Family Medical Leave, she was permanently demoted from her position as CBA in violation of the Family Medical Leave Act.   Her position was filled by a less qualified younger male.

### RETALIATION

47. The University and its agents violated the Texas Commission on Human Rights Act §21.055 by retaliation against Taylor.

48. The University retaliated against Taylor by removing her work location to a less desirable location.

49. The University retaliated against Taylor by demoting her.

44. The University retaliated against Taylor by transferring to a College of Health and Kinesiology, a gym.

50. The University retaliated against Taylor by reducing her salary.

51. The University retaliated against Taylor by conjuring up disciplinary action to place in her file.

52. The University's actions or omissions proximately caused Taylor to suffer damages.

53. Taylor has suffered damages, including but not limited to loss of income and loss of potential employment as well as pain and suffering and mental anguish.

## ATTORNEYS FEES AND COSTS

54. Taylor is entitled to attorney fees and costs under Texas Commission of Human Rights Act, Labor Code, Chapter 21, § 21.259, Revised Civil Statutes of Texas .

## JURY DEMAND

55. Plaintiff demands a trial by jury and tenders the appropriate fee.

## DAMAGES

56. The damages suffered by the plaintiff include lost wages as well as compensatory damages for the injuries she suffered at the hands of defendants, including, but not limited to, her mental anguish.

## RELIEF REQUESTED

Taylor asks this court to enter a judgment:

57. Declaring that the acts and practices described in the Compliant are in violation of Violation of Title VII and the Texas Commission on Human Rights Act;

58. Enjoining and permanently restraining these violations of Title VII and the Texas Commission on Human Rights Act;

59. Directing the University to pay Taylor actual and compensatory damages that she suffered, past and future;

60. Order the University to purge its files of false derogatory information regarding Taylor's performances of her duties;

61. Ordering the University to reinstate Taylor to her previous CBA position;

62. Awarding Taylor pre-judgment interest on the amounts owed at the maximum rate allowed by law;

63. Awarding Taylor the costs of this action, together with reasonable attorneys' fees and expert witness fees;

64. Awarding Taylor post-judgment interest on the amount of the judgment until paid at the maximum rate allowed by law;

65. Awarding Taylor such other relief, legal and equitable, as may be warranted. Reasonable medical care and expenses in the past. These expenses were incurred by Plaintiff, Taylor for the necessary care and treatment of incident complained of herein and such charges are reasonable and were usual and customary charges for such services in Fort

Bend County;

66. Awarding Taylor reasonable and necessary medical care and expenses which will, in all reasonable probability, be incurred in the future;

67. Awarding Taylor compensation for mental anguish in the past;

68. Awarding Taylor compensation for emotion and physical pain and suffering in the past;

69. Awarding Taylor compensation for mental anguish in the future;

70. Awarding Taylor compensation for physical impairment which, in all reasonable probability, will be suffered in the past, and future;

71. Awarding Taylor sufficient punitive damages to encourage Defendant to abide by the state and federal laws in situations involving their employees; and

72. Awarding plaintiff such other relief, legal or equitable, as may be warranted.

Respectfully submitted,
/s/ Peggy J. Lantz
State Bar No. 24002452
Southern District Number 22699
10497 Town & Country Way, Ste. 700
Houston, Texas 77024
832-242-6222
832-204-4242 Fax
peggylantz@lantzlaw.com


/s/ Lorri Meraz Grabowski
Lorri Meraz Grabowski
Texas Bar No. 24069817
800 Commerce Street
Houston, Texas 77002
713-471-3774
832-218-2651
lmglawoffice@gmail.com

## Certificate of Service

      I certify that a true and correct copy of this document has been served upon the defendant's through its counsel by means of the Court's electronic filing system on January 31, 2013.

                                                                /s/ Peggy J. Lantz