UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LINDA TAYLOR | § | CIVIL ACTION NO. |
|    Plaintiff | § | 4:12-CV-01975 |
| | § | |
| | § | |
| Vs. | § | |
| | § | |
| TEXAS SOUTHERN UNIVERSITY | § | |
|    Defendant | § | |

## TABLE OF CONTENTS

GLOSSARY OF ABBREVIATIONS.................................................................2

STATEMENT OF THE FACTS....................................................................3

ARGUMENT AND AUTHORITY..................................................................5

    A.    TSU has a sufficient indicia of independence so as not to be considered an arm of the state; suits in which funds paid to a successful Plaintiff come from other sources than the State Treasury............................6

    B.    Even if TSU is held to be an arm of the state, TSU consents to suit and voluntarily waives Eleventh Amendment immunity by receiving or benefiting from federal financial assistance........................11

    C.    Even if TSU is held to be an arm of the state, TSU could be immune from liability and still not be immune from suit, or vice versa, with regard to Eleventh Amendment protections..................................13

    D.    Even if TSU is held to be an arm of the state, TSU is not immune under the Eleventh Amendment from suits that arise from violations of the Due Process or Equal Protection Clauses of the Fourteenth Amendment, which works in tandem with the First Amendment free speech clause...............................................................13

    E.    The plain language of FSLA, ADEA, and FMLA abrogates the state's Eleventh Amendment immunity from suit.....................................15

    F.    The plain language of the Texas Labor Code and the Texas Government Code waives the State's Eleventh Amendment immunity from suit...............................................................17

    G.    If TSU is held to be an arm of the state, TSU is not immune under the Eleventh Amendment from suits that arise from violations of Taylor's rights in regard to 42 U.S.C., section 1983....................................18

SUMMARY OF ARGUMENT.....................................................................19

CONCLUSION..................................................................................20

CERTFICATE OF SERVICE.....................................................................21

INDEX OF AUTHORITIES.......................................................................22

# GLOSSARY OF ABBREVIATIONS

ADA –        Americans with Disabilities Act
FMLA –       Family Medical Leave Act
FSLA –       Fair Labor and Standards Act
ADEA –       Age Discrimination Employment Act
TSU –        Texas Southern University

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LINDA TAYLOR | § | CIVIL ACTION NO. |
| Plaintiff | § | 4:12-CV-01975 |
| | § | |
| | § | |
| Vs. | § | |
| | § | |
| TEXAS SOUTHERN UNIVERSITY | § | |
| Defendant | § | |

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS AND/OR IN THE ALTERNATIVE MOTION TO TAKE LEAVE OF THE COURT TO AMEND FIRST AMENDED ORIGINAL COMPLAINT**

Plaintiff, Linda Taylor, hereinafter referred to as Taylor, asks this Court to deny Texas Southern University's motion to dismiss under 12(b)(1).

## STATEMENT OF THE FACTS

Taylor began her career at TSU on or about February 9, 1999, as an Administrative Assistant in the Department of Educational Leadership and Foundation, within the College of Education. Taylor was promoted several times. In or about January 2010, Taylor was promoted to College Business Administrator II. Part of Taylor's duties in her new position included the monitoring of Time and Effort Reports, for the administrative staff. Taylor also found that some employees were wrongfully paid from various sources, i.e. collecting scholarship payments they were ineligible to receive. Subsequently she reported the problem to other supervisors and finally to the Board of Regents for TSU, on or about early Fall 2011.

As a result of Taylor's reporting activities, Taylor's work environment became hostile. The hostility included her receipt of harassing and abusive emails, verbal abuse, being falsely accused of stealing a computer, and violating her privacy and publishing her private information.

The hostile work environment and suffering retaliations constantly for her reporting contributed to serious health issues for Taylor, requiring hospitalization. She requested and was approved for Family Medical leave, took off for the time recommended by her physician(s), and returned to work in August of 2011.

Even while Taylor was off on FMLA leave having surgery Taylor was harassed and retaliated against. Taylor also reported these bad acts.

On or about April 11, 2011, Taylor suffered the adverse action from TSU of being temporarily demoted from CBA of the College of Education, to Administrative Assistant in the Health and Kinesiology Department. On August 16, 2011, Taylor received an official letter from Dean Poats notifying Taylor that, effective September 1, 2012, Taylor was demoted permanently and that her pay was reduced by 27.1 %, from $53,500.00 to $39,000.00.

Taylor's physical work area was moved to the gymnasium, a building commonly known on the campus to have environmental issues including, but not limited to: mold and toxic gases. TSU was aware of the environmental issues in the building.

Once Taylor was demoted and moved from her position, the position was filled with a young dark-skinned black man with less experience and education than Taylor, however he was paid more than she had been paid in the same position.

On or about April 15, 2011, Taylor filed her first grievance. TSU closed the grievance on November 1, 2011, in a letter stating there was no merit to her claims. On or about August 22, 2011, Taylor filed a claim with the EEOC. TSU filed an answer with the EEOC on October 12, 2011. On or about January, 2012, the EEOC notified Taylor that the case had been turned over to the U.S. Department of Justice. On March 30, 2012, Taylor was sent a Right to Sue letter.

On or about September 23, 2011, Taylor filed her second grievance with TSU. This grievance was also administratively closed, on November 1, 2011.

On or about October 2011, Taylor filed her third grievance with TSU. This grievance was never closed, nor was Taylor ever notified of a status on this grievance. On November 2, 2011, Taylor filed an Amended Complaint with the EEOC. On or about March 19, 2012, Taylor filed her fourth grievance. Taylor has not been advised as to the status of this grievance either. On April 2, 2012, Taylor received a "right to sue" letter from the U.S. Department of Justice. Taylor was wrongfully terminated in June of 2012. Taylor filed suit in the United States District Court on June 29, 2012.

## STANDARD OF REVIEW

The Defendant brings this motion to dismiss Plaintiff's claims under TCHRA, the Texas Whistleblowers Act, and the FMLA under 12(b)(1) of the Federal Rules of Civil Procedure, on the facts pled, claiming this Court has no jurisdiction to hear this case under the Eleventh Amendment.

The Fifth Circuit has spoken clearly about how a motion to dismiss under 12(b)(1) should be analyzed. A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction. See *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). Under this standard, the defendant's motion cannot succeed.

In the alternative, the Plaintiff motions to take leave of the Court to amend her pleadings per FRCP 15(2):

> *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

In this instance, justice would so require if the current complaint, in light of the issues specified in the Defendant's Motion to Dismiss, requires further specification of protections, given the factual content in this matter outlined in the current complaint.

The Defendant's argument that the Plaintiff's claims are barred by the Eleventh Amendment is an attack on the subject matter jurisdiction in fact, apart from the pleadings, and not a facial attack of the pleading. *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F2d 824, 891 (3rd Cir. 1977). The non-moving party is allowed the same protections allowed, as if it was brought under Rule 12(b)(6).

Therefore, in accordance with Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint and view them in a light most favorable to the Plaintiff. *Erikson v. Pardus*, 551 U.S. 81, 94 (2007). Enough facts to state a claim for relief that is plausible on its face must be pled, or the action will fail to state a claim to which relief can be granted. *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007).

This court also has jurisdiction of this case according to 28 U.S.C. §1331 and 28 U.S.C. §1343.

## ARGUMENT AND AUTHORITY

TSU has no proper ground to dismiss this any part of this action.

**A. TSU has a sufficient indicia of independence so as not to be considered an arm of the state; suits in which funds to be paid to a successful Plaintiff come from other sources than the State Treasury.**

The Eleventh Amendment to the U.S. Constitution states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment merely confirmed that the states as separate sovereigns can limit, with few exceptions, their susceptibility to suit. *See Alden v. Maine*, 527 U.S. 706, 728-29 (1999). The Eleventh Amendment was passed to protect states' independence as sovereigns, not to create a new state immunity. *See Alden*, 527 U.S. at 728-29; *Hans v. Louisiana*, 134 U.S. 1, 13 (1890).

Both the United States Supreme Court and the Texas Supreme Court have held that determining whether a division of state government is protected by Eleventh Amendment immunity is a question of federal law. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997); *San Antonio Indep. Sch. Dist.,* 936 S.W.2d 279 at 281-82; *Hoff v. Nueces County,* 153 S.W.3d 45 (Tex. 2004).

Eleventh Amendment immunity has been extended to state agencies that are viewed as arms of the state *to protect the state treasury from liability* (for emphasis) that would have had essentially the same practical consequences as a judgment against the State itself. *Lake Country Estates*, 440 U.S. 391 (1979) at 400-01. To determine whether an entity should be treated as an arm of the state under the Eleventh Amendment, the U.S. Supreme Court considers the state's law to determine the nature of the public entity seeking such immunity. *See Regents of the Univ. of Cal.*, 519 U.S. 425 (1997) at 429-30. For example, under California law, a county is designated as a body corporate and politic that can levy taxes to pay judgments against it, issue bonds payable from county taxes, sell property, and contract for the construction or repairs of structures. *Moor v. County of Alameda*, 411 U.S. 693, 719 (1973). The U.S. Supreme Court held that those provisions of California law indicated that Alameda County in California *had sufficient indicia of independence* (for emphasis) to make it distinct from the state for Eleventh Amendment purposes. *Id.* Applying this analysis, the U.S. Supreme Court has consistently held that neither counties nor cities are arms of the state entitled to protection under Eleventh Amendment immunity. *Alden*, 527 U.S. at 756; *Regents*

*of the Univ. of Cal.*, 519 U.S. at 430 n.6; *Lake Country Estates*, 440 U.S. at 401; *Mt. Healthy*, 429 U.S. 274 (1977) at 280. In the case at bar, evidence of TSU's independence from the state is abundant; the evidence is discussed and offered throughout this document. Just as counties were found to have their own source of revenue, sell property, and contract for construction or repairs, TSU has their own source of revenue; can buy and sell property; can contract for many purposes, in its own name, not in the name of the state; and has numerous other evidences of sufficient indicia of independence, documented infra.

The *Regents of the University of California* Court considered five factors in determining whether the University was an arm of the state. The five factors are: "[1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has power to take property in its own name or only in the name of the state, and [5] the corporate status of the entity." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425.

With regard to independence and how a money judgment would be satisfied, TSU's 2012 Financial Annual Report indicates that only 7% of TSU's revenues are funded by state monies. The report delineates the following as the breakdown of TSU's revenue for 2012: 60 percent of TSU's operating revenue came from tuition and other sources, 33% was derived by federal sources, and only 7% of TSU's revenue was state monies. See Exhibit "1", TSU's 2012 Annual Financial Report attached hereto and incorporated for all purposes. Any judgment against TSU is substantially limited to payment from university revenues that are drawn from revenue other than state monies.

Further, the satisfactions of judgments levied against TSU that come from the State of Texas are limited to a maximum of $25,000.00, per Texas legislation. See Exhibit "2", Senate Bill 1861 (enacted September 1, 2003), attached and incorporated for all purposes. The language of that legislation reads, "Under statutory authority the comptroller of public accounts pays claims for the State of Texas, except for those claims that are more than four years old ***or that are more than $25,000 in amount*** (highlighted for emphasis). These claims consist of warrants voided by the statute of limitations, outstanding invoices to private vendors, unpaid charges for Medicaid recipients, or court judgments." Section 9 of the legislation specifically indicates Texas Southern University as a possible beneficiary from this legislation in this capped amount only. See Exhibit "2." Therefore, any judgment that exceeded the $25,000.00 cap against TSU would by necessity have to be satisfied by other than state monies.

Any claim or judgment against TSU may also be satisfied from related criminal penalties which specifically outline that such awards be paid. *See U.S. v. Overseas Shipholding Group*, 672 F.Supp.2d 188 (2009). In *Overseas*, whistleblowers were statutorily benefited directly from the criminal language requiring a portion of the recoupment monies from recovered funds be paid directly to the whistleblower.

One example of likely criminal charges in this matter that will possibly provide for Plaintiff's recovery can be found in the Federal False Claims Act. Amendments to the Federal False Claims Act make the definition of fraud broad enough to include even the submission of claims with deliberate ignorance or reckless disregard for the truth of statements made in the claim for U.S. government spending or funds upon which the fraud claim is based. The burden of proof that must be met by the whistleblower's lawyer or the government's lawyer in a qui tam suit is the preponderance of the evidence standard. Because of the nature of the reporting that Taylor disclosed to several individuals and entities regarding federal and other monies that were stolen by employees of TSU, Taylor clearly stated in her pleading and numerous reports, it is almost certain that after, even minimal discovery is received, a qui tam claim will ensue directly related to the matter at bar under the Federal False Claims Act. Protection from retaliation for such reporting is an important provision of the Federal False Claims Act. Successful Plaintiffs directly benefit from the monies recouped under this act; therefore, at least a significant portion of any such judgment may come directly from the wrongdoers themselves and not the university, much less that State of Texas' treasury.

Additional evidence of TSU's independence from the state can be found in TSU's By-Laws which states that under Section 106.01 et. seq. of the Texas Education Code, the State Legislature has given TSU Board of Regents the power and authority to govern TSU. See Exhibit "3", TSU's Board of Regent's By-Laws, attached hereto and incorporated for all purposes. Additionally, the Texas Education Code states, "All tuition, local funds, and fees collected by an institution of higher education ***shall be retained and expended by the institution*** (highlighted for emphasis) and accounted for annually as provided in the general appropriations act." See Exhibit "4", Texas Education Code, Title 3, Subtitle A., Chapter 54, Subchapter A, Section 54.004, attached hereto and incorporated for all purposes. The TSU Board of Regent's By-Laws nor the Texas Education Code direct or even insinuate that any portion of the tuition and fees be directed back to the State of Texas.

TSU's By-Laws also state, "Texas case law has held that Boards of Regents of Texas

colleges and universities have wide discretion in exercising the power and authority granted by the legislature, including discretion in what action it takes directly and in what authority it delegates to other bodies within the University." See Exhibit "3", TSU's Board of Regent's By-Laws. The By-Laws state in "1.2. Duties and Responsibilities," that Section 51.352 of the Texas Education Code provides that the Board of Regents is, "expected to preserve ***__institutional independence__ and to __defend its right to manage its own affairs__*** (highlighted for emphasis) through its chosen administrators and employees." See Exhibit "5", TSU's Board of Regent's By-Laws. Clearly TSU has sufficient independence from the State to govern and manage its own affairs.

An additional source of financial independence and independent governing ability can be found in TSU's Manual of Administrative Policies and Procedures, regarding the subject area of "Intellectual Property." This policy delineates that "any inventions, designs, improvements and discoveries made by an employee of the University during the term of his or her employment solely or jointly with others which are made with the University's equipment, supplies, facilities, trade secrets, or time, or the University's actual research or development, of which result from any work performed by an employee or faculty member of the Universit***y, shall be the exclusive property of the University*** (highlighted for emphasis) . . . . The University ***shall have the right to keep inventions, such as trade secrets, if it so chooses*** (highlighted for emphasis)." See Exhibit "5", MAPP Policy 08.02.01: Area: Intellectual Property; Subject: Intellectual Property Policy, attached hereto and incorporated for all purposes. TSU can take this property in its own name. There is no direction or implication that TSU take the property in the name of the state, or redirect any benefit of the intellectual property back to the state. The language used was "***__exclusive property of the University__*** (highlighted for emphasis).

Another example of TSU's financial independence and independent governing ability is TSU's MAPP Policy, 07.01.01, regarding the subject area of "Acceptance of Gifts and Property Policy." This policy states that, "The support of the University and its programs comes through charitable gifts such as gifts of cash, checks, credit cards, securities, real estate, art, rare books, paintings, antiques, matching gifts from corporations, memorial, and honorary gifts. Such gifts are an investment that help the University provide quality education for its students." See Exhibit "6," MAPP Policy 07.01.01: Subject: Acceptance of Gifts and Property Policy, attached hereto and incorporated for all purposes. Again, TSU can take this property in its own name. There is no direction or implication that TSU take

the property in the name of the state, or that they are required to return any benefit from the gifts and property back to the state.

A charter was given to TSU by the Texas Legislature on March 3, 1947. A charter is defined by Black's Law Dictionary Free Online Legal Dictionary 2nd Ed. as: "the act of <u>legislature</u> that creates a <u>corporation</u> and sets forth its franchise that defines the organization of a corporation." When the Texas Legislature issued a charter to TSU, they were in effect creating an independent corporation, only loosely connected to the State of Texas. TSU is at least a corporation by estoppel, if not a de facto corporation.

TSU has the authority to buy and sell real property in its own name. See Exhibit "7", Attorney General of Texas Opinion No. GA- 0894, attached hereto and incorporated for all purposes.

TSU's own indemnity clauses on summer camp brochures releases, discharges, and indemnifies the "***Curators of Texas Southern University and its representatives, employees, and agents*** (highlighted for emphasis) from any and all debits, claim demands, actions, damages, causes of action, judgments or suits of any kind, " --- there is no mention of release, discharge, or indemnity for the State of Texas. See Exhibit "8", TSU Summer Camp Brochure and Application, attached hereto and incorporated for all purposes. The University is the independent entity foreseen as the potential responsible party in suits, on either side of the suit, not the State of Texas.

Similarly and closer to the case at bar, TSU's Visiting Faculty Agreement contains a liability clause that indemnifies, "TSU, its Regents, officers, agents and employees harmless from any claim, cause of action, or judgment against them, . . ." --- not the State of Texas. See Exhibit "9", TSU Visiting Faculty Agreement, attached hereto and incorporated for all purposes. Again, the University is the independent entity foreseen as a potential party, not the State of Texas.

TSU's Regent By-Laws requires TSU to consult with TSU's General Counsel "regarding pending or contemplated litigation, settlement offers, or confidential matters." --- not the Office of the Attorney General. See Exhibit "3", TSU's Regent By-Laws – 6.16; Executive Sessions, (a). The By-Laws anticipate TSU's, not the state's, involvement in litigation. TSU's general counsel versus the Office of the Attorney General is the party responsible for those decisions and accountability, according to TSU's Regent By-Laws.

TSU has sued on behalf of TSU, not the State of Texas. See Exhibit "10", Agreed Final Judgment (dated 11/3/2004) in *Texas Southern University v. AAffordable Climate et*

*al.*, 2004-21745 in the 11th Judicial District Court of Harris County, Texas, attached hereto and incorporated for all purposes.  Included as  Exhibit "12". In the attached final judgment, TSU, not the State of Texas, sued the Defendant.  TSU, not the State of Texas, received the judgment against the Defendant.  Even Harris County and local cities and municipalities, which by the aforementioned precedent have not considered arms of the state, take criminal actions, large and small, in the name of the State of Texas; yet they are not arms of the state for judicial purposes under the Eleventh Amendment.  Clearly, an entity such as a county, city, municipality, and even a university can be a "state" entity in name or title only and not be determined to be an arm of the state for Eleventh Amendment purposes.

The holdings of the U.S. Supreme Court are dispositive.  As discussed supra, TSU's satisfaction of a money judgment would be extremely limited, if any portion was able to be satisfied out of state funds at all --- the state treasury would be protected and is protected by legislation; TSU anticipates, protects with release and indemnity clauses against suits on behalf of TSU, not the State of Texas; TSU sues in its own name and is awarded judgments in its own name; TSU has the power to take property in its own name; and TSU's charter provides the basis for its corporate status by estoppel.   TSU is independently governed, makes independent determinations regarding their financial budgets and their revenues, is almost exclusively funded by monies other than state funds, has the right to contract, accepts gifts and property, and buys and sells property.  TSU possesses sufficient indicia of independence, financially, by its self-governance --- as legislatively granted and judicially operative in fact, and is therefore not an arm of the state for purposes of the Eleventh Amendment.

**B.      Even if TSU is held to be an arm of the state, TSU consents to suit and voluntarily waives Eleventh Amendment immunity by receiving or benefiting from federal financial assistance.**

The United States Code, Title 42, §200d-7, Civil Rights Remedies Equalization, reads:

(a)       General provision
   (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial

assistance.

(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

Violation of the aforementioned Acts, Amendments, or other provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance will nullify the doctrine of sovereign immunities derived from the 11th amendment.

If the state or local government entities receive federal funding for whatever purpose, they cannot claim sovereign immunity if they are sued in federal court for discrimination. The U.S. Code, Title 42, §200d-7, Civil Rights Remedies Equalization quoted supra explicitly says this.

The Court in *Thomas v. University of Houston,* 155 Fed. Appx. 115; 2005 U.S. App. LEXIS 23952, attached hereto as Exhibit "11", held that as long as the state entity receives federal funding, then the sovereign immunity for discrimination cases is not abrogated, but voluntarily waived. It was held that since the receiving of the federal funds - such as FAFSA and affirmative action monies - was optional, then the waiver of sovereign immunity was optional. If a state entity wanted its sovereign immunity back, all they have to do is stop receiving federal funding. See *Thomas v. University of Houston*, 2005 WL 2902207 (Fifth Cir. Nov. 4, 2005).

In the case at bar and in view of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), the evidence will show that Taylor was denied reasonable accommodations even after her numerous written requests from Taylor, her doctor, and attorneys she was forced to hire, to be moved from the demotion location which was toxic to her health. Taylor's ability to work was impacted so severely that she eventually had to take periodic days off at the written and noticed request of her physician to find relief. She had accumulated ample sick leave over her many years of service. TSU delineated her absence from work as the reason for terminating her employment. Taylor had a physical impairment, noticed by not just Taylor, but her physician as well, which substantially limited one or more major life activity, her ability to work. Taylor was able to perform the essential functions of the job as an administrative personnel for TSU, for which she was hired, if TSU would have made any of the number of reasonable accommodations requested,

including but not limited to: having her relocated to another office including her prior office, or the work environment had been cleaned; neither of which would have caused the employer undue hardship. As TSU does voluntarily receive federal assistance not only through grants and/or cooperative agreements, but also through financial assistance for students, TSU is not immune under the Eleventh Amendment of the Constitution. TSU can however, choose not to accept federal funding.

Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 et seq., prohibits employment discrimination based on gender or blindness by educational institutions receiving or benefiting from federal financial assistance, and the Age Discrimination Act of 1975, 42 U.S.C. 6101 et seq., prohibits employment discrimination based on age. Additionally, Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq., prohibits discrimination in employment where the objective of federal financial assistance is to provide employment.

In the case at bar, Taylor was replaced with a dark-skinned, black male, who was under the age of 40 and had much less experience and less education. He was paid however, more than Taylor for the same job description and title. Some of the funding to pay Taylor came from federal funds.

**C.    Even if TSU is held to be an arm of the state, TSU could be immune from liability and still not be immune from suit, or vice versa, with regard to Eleventh Amendment protections.**

Immunity under the Eleventh Amendment can be protection for either "suit" or "liability," both or neither. *Lombardo v. Pennsylvania Department of Public Welfare*, 540 F.3d 190, 196-200 (3rd Cir. 2008). Given that understanding of the distinctions in potential immunity protections, TSU, for example, may be found to have immunity from liability, but not from suit. Taylor has requested many forms of relief, including but not limited to reinstatement. Some of the requested relief would not need any support of the State's treasury.

**D.    Even if TSU is held to be an arm of the state, TSU is not immune under the Eleventh Amendment from suits that arise from violations of the Due Process or Equal Protection Clauses of the Fourteenth Amendment, which works in tandem with the First Amendment free speech clause.**

The Supreme Court has interpreted the due process clause of the Fourteenth Amendment as protecting the rights in the First Amendment from interference by state

governments. The First Amendment free speech clause and the Fourteenth Amendment equal protection and due process clauses can work in tandem to ensure government treats different types of speakers or speech in a similar fashion.

Taylor was retaliated against for reporting TSU employees stealing of time and several other serious violations at an open to the public Board of Regents meeting. She prepared and utilized a digital slide show with the evidence of the wrongdoing which was shown at a presentation to the Board of Regents during said open board meeting. After her reporting these and other wrongful acts including but not limited to discrimination, Taylor endured many months of harassment, a hostile work environment, a demotion, placement in a toxic environment that made her physically ill, a significant reduction in pay, and her eventual wrongful termination. Subsequent to her first report to the Board of Regents, Taylor did complain to the Board of Regents regarding the retaliation she received after first reporting, per her job duties. Taylor subsequently requested further opportunities to present complaints to the Board of Regents as part of a regular course of due process and was denied.

Even though TSU is largely proprietary in nature, as a great majority of its funding flows from tuition and fees, some of the school's support comes from federal and state funding, as discussed supra. The stealing of time from a university and discrimination are public concerns. The First Amendment prohibits state retaliation against a public employee for speech made as a citizen on a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 146-47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

The Supreme Court has held that public criticism by government employees of their employers is protected speech. *Pickering v. Bd. of Ed.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see Givhan v. W. Line Consol. Sch. Dist.,*4 39 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Retaliation for this kind of speech violates the First Amendment as incorporated into the Due Process Clause, and Congress has the power to provide a private remedy for it. *McCauley v. Georgia,* 466 Fed. Appx. 832, 126 S.Ct. 877, No. 11-11817 (unpublished opinion) included as Exhibit "12"; *Alaska v. EEOC*; 564 F.3d 1062 (2009). The *Alaska* Court considered the whistleblower's claim of retaliatory discharge and distinguished it from the pay disparity and sexual harassment claims because the claim for retaliatory discharge did not allege differential treatment because of race or sex. Rather, the whistleblower was punished for speaking up about harassment. The Court decided that the Fourteenth Amendment's due process clause incorporates the First Amendment's free

speech guarantees, so if the whistleblower alleged conduct that would violate the First Amendment, then the legislature abrogates state immunity as to that claim. *Id.*

The Ninth Circuit has held that complaints of sexual harassment can constitute such speech. *Freitag v. Ayers,* 468 F.3d 528, 545 (9th Cir.2006); *see also Connick,* 461 U.S. 138 at 148 n. 8, 103 S.Ct. 1684 (racial discrimination in a public workplace is "a matter inherently of public concern").

The *Alaska* Court held that while the whistleblower did not allege that the Governor's Office intentionally discriminated against her through an official policy promoting sexual harassment, the office may nevertheless have violated the Equal Protection Clause by ***intentionally refusing to redress the sexual harassment*** of the whistleblower by another employee. *Alaska v. EEOC*; 564 F.3d 1062 (2009), (citing *Bohen v. City of East Chicago,* 799 F.2d 1180 at 1187 (holding that a government employee can make "a claim of sexual harassment under the equal protection clause" by "showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination")).

Taylor discovered and reported TSU's wrongdoing, the theft of time or fraudulent reporting of time, which had previously been acknowledged as existing by the male president of TSU.  However, when Taylor spoke out against the wrongdoing she was severely retaliated against, whereas the male president was not.  Taylor used her first amendment right to publically announce TSU's wrongdoings, including TSU's discrimination against her age, gender, and color, and did file grievances and complaints to that effect.  TSU not only intentionally refused to redress the discrimination and violation of her free speech, as TSU had been noticed on numerous occasions regarding these wrongdoings, but they ignored and condoned the bad actors that were then free to continue their retaliation against her that physically and emotionally harmed her and led to Taylor's termination.

Consequently, if TSU is a held to be an arm of the state, they waive their Eleventh Amendment immunity for any wrongdoing that violates the First Amendment free speech clause or the Fourteenth Amendment due process or equal protection clauses.

    **E.**       **The plain language of the FSLA , ADEA, and the FMLA abrogates the state's Eleventh Amendment immunity from suit.**

A "general authorization for suit in federal court" is an insufficient expression of

congressional intent to abrogate state sovereign immunity, *Atascadero State Hospital v. Scanlon,* 473 U.S. 234 (1985) at 246, 105 S.Ct. 3142, as are inferences from legislative history and statutory purpose, *Dellmuth v. Muth,* 491 U.S. 22 at 230, 232, 109 S.Ct. 2397. But *Dellmuth* and *Atascadero* "do not preclude congressional elimination of sovereign immunity in statutory text that clearly subjects States to suit for monetary damages, though without explicit reference to state sovereign immunity or the Eleventh Amendment." *Dellmuth,* 491 U.S. at 233, 109 S.Ct. 2397 (Scalia, J. concurring). In *Alaska*, the legislative text made congressional intent to abrogate state sovereign immunity "unmistakably clear." *Atascadero,* 473 U.S. at 242, 105 S.Ct. 3142; *Alaska v. EEOC*; 564 F.3d 1062 (2009). The text expressly covered state employees, and expressly gave them a right to collect damages "payable *by the employer*"— the state. 42 U.S.C. § 2000e-5(g)(1) (emphasis added). *Id.*

The only way Congress could have been clearer would have been to say "this act abrogates state sovereign immunity." But the Supreme Court has made it quite plain that such magic words are unnecessary. Twice it has considered statutes with provisions like Alaska's legislative text—giving employees a cause of action for damages, and separately providing that state employers will pay—and twice it concluded that the statutes adequately expressed Congress's intent to abrogate state sovereign immunity, even though neither statute includes the terms "abrogate," "state sovereign immunity" or "Eleventh Amendment." *Alaska v. EEOC*; 564 F.3d 1062 (2009) (citing *Kimel v. Florida Board of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), considered the Age Discrimination in Employment Act (ADEA)). One section of the ADEA incorporates an enforcement provision from a separate statute, the Fair Labor Standards Act (FLSA), "authoriz[ing] employees to maintain actions for backpay `against any employer (including a public agency) in any Federal or State court of competent jurisdiction.'" *Alaska v. EEOC*; 564 F.3d 1062 (2009) (citing *Kimel v. Florida Board of Regents,* 67-68, 73-74, 120 S.Ct. 631 (quoting 29 U.S.C. § 216(b), as cross-referenced in 29 U.S.C. § 626(b)). A separate section of the FLSA defines "public agency" to include "the government of a State or political subdivision thereof." *Alaska v. EEOC*; 564 F.3d 1062 (2009) (citing *Kimel v. Florida Board of Regents,* 74, 120 S.Ct. 631 (quoting 29 U.S.C. §203(x)). The Court held that "[r]ead as a whole, the plain language of these provisions clearly demonstrates Congress' intent to subject the States to suit for money damages at the hands of individual employees," *Alaska*

*v. EEOC*; 564 F.3d 1062 (2009) (citing *Kimel v. Florida Board of Regents,* 74, 120 S.Ct. 631), explaining that "our cases have never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time," *Alaska v. EEOC*; 564 F.3d 1062 (2009) (citing *Kimel v. Florida Board of Regents,* 76, 120 S.Ct. 631).

Each of the Plaintiff's claims in *Alaska* alleged actual violations of the Fourteenth Amendment. The text of said legislation validly abrogated Alaska's sovereign immunity with respect to those claims. *Id.*

The Court in *Nevada Department of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003), likewise held that provisions of the Family and Medical Leave Act (FMLA) unequivocally expressed Congress's intent to abrogate state sovereign immunity. Like the ADEA, the FMLA authorizes suits against employers, and incorporates a definition of employers that includes public agencies, and a definition of public agencies that includes states, but doesn't refer to state sovereign immunity or the Eleventh Amendment. In *Alaska,* the text of the legislation in question was cut from the same cloth as the ADEA and the FMLA; its reference to states as potential defendants who must answer in damages was clear, and its focus on government employers was sharper, than in the two other statutes. *Id.* *Alaska*'s legislation's provisions, entitling state employees to "back pay ... payable by the employer," 42 U.S.C. §§ 2000e-5(g)(1), 2000e-16c, unmistakably expressed Congress's intent to allow suits against states for damages. The Court in *Alaska,* stated that as in *Kimel* and *Hibbs,* "[t]he clarity of Congress' intent here is not fairly debatable." *Alaska v. EEOC*; 564 F.3d 1062 (2009) (citing *Hibbs,* 538 U.S. at 726, 123 S.Ct. 1972).

Courts have dismissed employment discrimination suits seeking damages against states in federal court under the Americans with Disabilities Act (ADA) and self-care provisions of the Federal Medical Leave Act, but sovereign immunity has not been a bar to employment discrimination suits against the states under these statutes seeking injunctive relief, including reinstatement. In the context of disability discrimination in higher education, numerous courts of appeal have held that Title II of the ADA validly abrogates state sovereign immunity. Following the Court in *Georgia*, some prisoner suits under Title II of the ADA alleging constitutional violations have been allowed to proceed against states. *McCauley v. Georgia,* 546 U.S. at 158, 126 S.Ct. 877.

**F.    The plain language of the Texas Labor Code and the Texas**

**Government Code waives the State's Eleventh Amendment immunity from suit.**

The Texas Labor Code which provides the law against retaliation:

> *Sec. §21.055. RETALIATION*.  An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:
> > (1)  opposes a discriminatory practice;
> > (2)  makes or files a charge;
> > (3)  files a complaint;  or
> > (4)  testifies, assists, or participates in any manner
> in an investigation, proceeding, or hearing.

The Texas Government Code provides the redress available against a violation of the law and a clear explicit waiver of Eleventh Amendment immunity:

> *Sec. 554.002.  RETALIATION PROHIBITED FOR REPORTING VIOLATION OF LAW*.
> > (a)  A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.
> > (b)  In this section, a report is made to an appropriate law enforcement authority if the authority is a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to:
> > > (1)  regulate under or enforce the law alleged to be violated in the report;  or
> > > (2)  investigate or prosecute a violation of criminal law.
>
> *Sec. 554.0035.  WAIVER OF IMMUNITY*.  A public employee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter.  Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter.

Therefore, if TSU is held to be an arm of the State of Texas, the Texas legislature provided that any immunity they may claim would not be available for their retaliatory bad acts against a whistleblower.

**G.     If TSU is held to be an arm of the state, TSU is not immune under the Eleventh Amendment from suits that arise from violations of Taylor's rights in regard to 42 U.S.C., section 1983.**

TSU denied Taylor due process under the Fourteenth Amendment.  The constitutional right to due process is not an abstract right to hearings conducted according to fair procedural rules. Rather, it is the right not to be deprived of life, liberty, or property

18

without such procedural protections. *Monk v. Huston,* 340 F.3d 279, 282-83 (5th Cir. 2003). Consequently, "[t]o bring a procedural due process claim under §1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Baldwin v. Daniels,* 250 F.3d 943, 946 (5th Cir. 2001).

There were many adverse employment actions directed at Taylor, ending with the termination of her employment and consequential loss of her TRS retirement. Many of Taylor's attempts to procedurally process these complaints through the proper channels were never addressed, completed, properly investigated, or resolved by TSU.

The Supreme Court has stated that substantive due process "prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno,* 481 U.S. 739, 746 (1987).

The evidence will show that Taylor complains of conduct that shocks the conscience or interferes with rights so fundamental that they are implicit in the concept of ordered liberty. Taylor was so violated in her workplace that her physical and psychological safety was jeopardized. Some examples of the violations are: continual harassment; physically being made to endure toxic gases, roach and insect infestations; having to endure hostility in the workplace --- i.e. getting verbally berated and abused on numerous occasions; and having her new dean spread false sexually accusations about Taylor and the new dean's husband, who Taylor does not know personally, to other staff members by announcing the accusation as fact in a meeting and writing and distributing the same. In these abuses that shock the conscience, Taylor's rights implicit in the concept of "ordered liberty" were obliterated. TSU has violated Taylor's protected rights under 42 U.S.C. Section 1983 and is therefore not immune from suits under the Eleventh Amendment.

## SUMMARY OF ARGUMENT

TSU's satisfaction of a money judgment would be extremely limited, if at all able to be satisfied out of state funds; TSU anticipates, protects with release and indemnity clauses against suits on behalf of TSU, not the State of Texas; TSU sues in its own name and is awarded judgments in its own name; TSU has the power to take property in its own name; and TSU's charter provides the basis for its corporate status by estoppel. TSU is independently governed, makes independent determinations regarding their financial budgets and their revenues, is almost exclusively funded by monies other than state funds,

has the right to contract, accepts gifts and property, and buys and sells property. TSU possesses sufficient indicia of independence, financially, by its self-governance, as legislatively granted, and judicially operative in fact, and is therefore not an arm of the state for purposes of the Eleventh Amendment.

　　　　Even if TSU is held to be an arm of the state, TSU consents to suit and voluntarily waives Eleventh Amendment immunity by receiving or benefiting from federal financial assistance. TSU violated section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], and title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], with regard to Taylor; all while being a recipient of Federal financial assistance.

　　　　TSU may be immune from liability and still not be immune from suit, or vice versa, with regard to Eleventh Amendment protections.

　　　　With regard to suits regarding violations of the due process or equal protection clause of the Fourteenth Amendment that at times work in tandem with the First Amendment's free speech clause, TSU is not immune for their Constitutional violations against Taylor.

　　　　The plain language of the FSLA, ADEA, and the FMLA abrogates the state's Eleventh Amendment immunity from suit with regard to violations of these federal acts against Taylor.

　　　　TSU is not immune under the Eleventh Amendment for its violations against Taylor regarding 42 U.S.C., section 1983.

　　　　TSU has no proper ground to dismiss this any part of this action. TSU has repeated hidden behind the Eleventh Amendment while experiencing very little, if any, supervision by the state government. Other state government agencies don't seem to behave with the same disregard for the federal law as does TSU as evidenced by the multitude of lawsuits filed in this court and others against TSU. **Apparently, they believe that they are an arm of the State of Texas only when it is convenient to them to cover their wrong-doings.**

CONCLUSION

　　　　**For the reasons stated, the Plaintiff, Linda Taylor, asks this Court to deny Defendant's Motion to Dismiss.**

　　　　　　　　Respectfully submitted,

/s/ Peggy J. Lantz
State Bar No. 24002452
Southern District Number 22699
10497 Town & Country Way, Ste. 700
Houston, Texas 77024
832-242-6222
832-204-4242 Fax
peggylantz@lantzlaw.com

/s/ Lorri Meraz Grabowski
Lorri Meraz Grabowski
Texas Bar No. 24069817
800 Commerce Street
Houston, Texas 77002
713-471-3774
832-218-2651
lmglawoffice@gmail.com

## Certificate of Service

I certify that a true and correct copy of this document and its supporting exhibits have been served upon the defendant's through its counsel by means of the Court's electronic filing system on April 12, 2013.

/s/ Peggy J. Lantz

# INDEX OF AUTHORITIES

**Cases:**

*Alaska v. EEOC*; 564 F.3d 1062 (2009)

*Alden v. Maine*, 527 U.S. 706, 728-29 (1999)

*Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985)

*Baldwin v. Daniels,* 250 F.3d 943, 946 (5th Cir. 2001)

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)

*Bohen v. City of East Chicago,* 799 F.2d at 1189 (7th Cir.1986)

*Connick v. Myers,* 461 U.S. 138, 146-47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)

*Dellmuth v. Muth,* 491 U.S. 22, 109 S.Ct. 2397 (1989)

*Erikson v. Pardus*, 551 U.S. 89 (2007)

*Freitag v. Ayers,* 468 F.3d 528, 545 (9th Cir.2006)

*Givhan v. W. Line Consol. Sch. Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)

*Hans v. Louisiana*, 134 U.S. 1 (1890)

*Hoff v. Nueces County,* 153 S.W.3d 45 (Tex. 2004)

*Kimel v. Florida Board of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)

*Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979)

*Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008)

*Lombardo v. Pennsylvania Department of Public Welfare*, 540 F.3d 190, 196-200 (3rd Cir. 2008)

*McCauley v. Georgia,* 466 Fed. Appx. 832 (unpublished) (11th Cir. 2012)

*Monk v. Huston,* 340 F.3d 279 (5th Cir. 2003)

*Moor v. County of Alameda*, 411 U.S. 693 (1973)

*Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F2d 824 (3rd Cir. 1977)

*Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)

*Nevada Department of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003)

*Pickering v. Bd. of Ed.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)

*Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425 (1997)

*San Antonio Indep. Sch. Dist. v. McKinney,* 936 S.W.2d 279 (1996)

*Thomas v. University of Houston*, 155 Fed. Appx. 115; 2005 U.S. App., LEXIS 23952 (5th Cir. Nov. 4, 2005)

*U.S. v. Overseas Shipholding Group*, 672 F.Supp.2d 188 (2009)

*U.S. v. Salerno,* 481 U.S. 739, 746 (1987)

## Constitution and  Statutes:

United States Constitution
     Amend. I
     Amend. XI
     Amend. XIV

Americans with Disabilities Act of 1990, Tit. IV, 42 U.S.C. 12202

Civil Rights Act 1964, Tit. VI, 42 U.S.C. 2000d et seq.
     2000d-7

Age Discrimination Act of 1975, 42 U.S.C. 6101 et seq.,

Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794)

Education Amendments of 1972, Title IX, 20 U.S.C. 1681 et seq.

28 U.S.C. §1331 and §1343

42 U.S.C. §2000d-7 and §1983

Texas Labor Code §21.055

Texas Government Code §554.002 and §554.002

## Rules and Regulations:

Fed. R. Civ. P. 12(b)(1)

Fed. R. Civ. P. 15(2)

**<u>Exhibits:</u>**

Exhibit "1", TSU's 2012 Annual Financial Report

Exhibit "2", Senate Bill 1861

Exhibit "3", TSU's Board of Regent's By-Laws

Exhibit "4", Texas Education Code, Title 3, Subtitle A., Chapter 54, Subchapter A, Section 54.004

Exhibit "5", MAPP Policy 08.02.01: Area: Intellectual Property; Subject: Intellectual Property Policy

Exhibit "6", MAPP Policy 07.01.01: Subject: Acceptance of Gifts and Property Policy

Exhibit "7," Attorney General of Texas Opinion No. GA- 0894

Exhibit "8", TSU Summer Camp Brochure and Application

Exhibit "9", TSU Visiting Faculty Agreement

Exhibit "10", Agreed Final Judgment in *Texas Southern University v. AAffordable Climate et al,* in the 11th District Court of Harris County, Texas, Cause No. 2004-21745

Exhibit "11", *Thomas v. University of Houston,* 155 Fed. Appx. 115; 2005 U.S. App., LEXIS 23952 (5th Cir. Nov. 4, 2005)

Exhibit "12". *McCauley v. Georgia,* 466 Fed. Appx. 832 unpublished (11th Cir. 2012)