UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| LINDA TAYLOR § | |
| § | |
| **Plaintiff,** § | |
| § | |
| VS. § | Civ. Action No. 4:12-cv-01975 |
| § | |
| TEXAS SOUTHERN UNIVERSITY § | |
| § | |
| **Defendant.** § | |

**MEMORANDUM & ORDER**

This case arises out of Plaintiff Linda Taylor's ("Plaintiff's" or "Ms. Taylor's") employment with — and demotion and termination by — Defendant Texas Southern University ('Defendant" or "TSU"). Before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 31.) After considering the Motion, all responses and replies, and the applicable law,[1] the Court concludes that the Motion should be **GRANTED.**

**I. BACKGROUND**[2]

Plaintiff, a 53-year-old light-skinned black woman, was hired by TSU in 1999 as an Administrative Assistant. (Doc. No. 10, ¶¶ 10-11; Doc. No. 31-2 at 2.) Soon thereafter, she began to serve as an Executive Assistant to the Dean of the College of Education ("the College"), who, starting in August 2001, was Jay Cummings. (Doc. No. 38-3 at 1.) Mr. Cummings raved about Ms. Taylor's work in that role, praising her for "always [going] above and beyond the call of her duties to perform any task asked of her." (*Id.*) For a period stretching from Sept. 2008 through Aug. 2009, Mr. Cummings

---

[1] The Court has reviewed and considered the party's supplemental filings (Doc. No 40; Doc. No. 41) in addition to the documents submitted with the motion and the response.
[2] The following facts in Section I are undisputed, except where noted.

1

gave Ms. Taylor an outstanding performance review, assigning her a perfect twenty points out of twenty. (Doc. No. 35 at 26.)

In or around July 2010, TSU instituted the position of College Business Administrator ("CBA") and allowed Mr. Cummings to choose anyone already employed within the College to fill the position. (Doc. No. 10, ¶ 14; Doc. No. 38-3 at 1.) He chose Plaintiff. (Doc. No. 38-3 at 1.) The CBA position was designed to "manage the administrative, financial, budgetary and human resource operations of the respective school, college, or academic unit." (Doc. No. 31-3 at 2.) As early as December of that year, Plaintiff began to alert Mr. Cummings about "staff members turning in inaccurate time and effort reports," as well as "issues with faculty members not being present during their posted office times." (Doc. No. 38-3 at 2.) Plaintiff also reported to Marli Bober, then TSU's Associate Vice President of Business Operations and Systems, that certain individuals were filing inaccurate time sheets. (Doc. No. 38-5 at 1.) Ms. Taylor reaffirmed those reports of falsified time sheets and other financial wrongdoing in several 2011 reports to the Board of Regents. (Doc. No. 31-1 at 8.)

Though it was Ms. Taylor's job to make such reports, she faced "hostility" from her colleagues as a result. (Doc. No. 38-3 at 2.) Plaintiff reports that, by January 2011, she was facing hostility from several TSU employees. (Doc. No. 31-1 at 5.) One of Plaintiff's former colleagues, Billy Sellers, corroborated those reports and stated that he received similar treatment when she reported academic fraud and financial misconduct. (Doc. No 38-4.)

Mr. Cummings resigned in early 2011, and he was replaced as dean by Lillian Poats on or around April 1, 2011. (Doc. No. 31-1 at 9; Doc. No. 31-4 at 1.) Shortly after

2

taking over as Dean of the College, Ms. Poats received a slew of complaints about Plaintiff's stewardship of the College's business operations. Ms. Poats was informed by two College consultants that they had not been paid since September 2010. (Doc. No. 35 at 24.) Two other adjunct faculty members reported not being paid on time and/or at the correct rate since January 2011. (*Id.*) Five administrative assistants in the College complained that they were not receiving the supplies they required. (*Id.* at 25.) Three graduate assistants asserted that they were owed stipends and/or travel payments and some other faculty members complained that they too were owed travel reimbursements. (*Id.*) At least seven different entities had sent past-due notices for invoices that the College was supposed to have paid. (*Id.*)

Consequently, Ms. Poats wrote a letter to Plaintiff identifying four concerns: "(1) late payments to the College's vendors; (2) adjuncts, consultants, and graduate assistants working for the College without being paid; (3) improper processing of travel requests and reimbursement forms; and (4) the failure to ensure that departments were receiving supplies that had been ordered." (Doc. No. 31-4 at 2; *see also id.* at 6.) Ms. Taylor was "reassigned temporarily pending assessment" of the concerns outlined in the letter — concerns that Poats said had "come to [her] attention repeatedly since [her] appointment as Interim Dean." (*Id.* at 6.) Plaintiff was replaced on an interim basis by Derrick Wilson. (*Id.* at 3.)

On April 18, 2011, Plaintiff responded in writing to her then-temporary demotion, asserting that Ms. Poats had relied upon "incomplete and inaccurate information." (Doc. No. 35 at 9.) Plaintiff responded to each of the performance deficiencies Ms. Poats had identified. Plaintiff did not deny that any of the problems existed; for most, she cited

3

either mistakes by other staff members or changes to office protocol as the source of the inadequacy. (*See id.* at 9-10.) In that same month, Ms. Poats requested that TSU's Provost undertake an audit of the College's business administration. (Doc. No. 31-4 at 3.)

The results of that audit came back in August 2011. The audit revealed that the "College's internal audit controls for financial transactions were below target." (Doc. No. 31-3 at 3.) More specifically, the audit showed five distinct deficiencies:

> (1) complete and timely personnel action forms by the College prior to employees starting work; (2) improper cash controls; (3) slow and non-payment of vendors due to process deficiencies involving the CBA and accounts payable; (4) slow payments and process of travel and expense reimbursements; and (5) deficiencies in controls related to time and effort reports.

(*Id.*) The audit report outlined its methodology and findings in significant detail. (*See id.* at 11-24.)

Plaintiff took a leave of absence under the Family and Medical Leave Act ("FMLA") from May until August of 2011. (Doc. 10 ¶ 25; Doc. No. 11 ¶ 21.) When Plaintiff returned, Ms. Poats had received the audit results and informed Plaintiff on Aug. 16, 2011 that Plaintiff's demotion to Senior Administrative Assistant in the Department of Health & Kinesiology would be made permanent. (Doc. No. 31-4 at 3, 23.) Mr. Wilson then assumed the CBA role on a permanent basis.[3] (*Id.* at 3.) In his affidavit, Mr. Cummings alleges that TSU did not follow the proper procedure when it demoted Plaintiff, but he does not elaborate on that allegation. (Doc. No. 38-3 at 2.) Cummings also opines that the decision to tap Mr. Wilson to replace Plaintiff was curious, given that

---

[3] There is a discrepancy in the record as to whether this is so. Whereas Ms. Poats states in her affidavit that Wilson assumed the CBA job permanently in August 2011, TSU's Nov. 10, 2011 letter to the EEOC states that "Mr. Wilson continues to serve in the 'Interim' position." (*See* Doc. No. 35 at 24.) For reasons the Court explains below, however, this discrepancy is not material.

4

Mr. Wilson was not hired from within the College of Education, which had generally been required. (*Id*.)

Upon being demoted and reassigned, Plaintiff's office was relocated to a gymnasium that she reports contained mold and toxic gasses, which she says caused serious adverse health effects. (Doc. No. 38-1 at 2.) Plaintiff was absent from work regularly while assigned to the Health & Kinesiology department, missing as many as forty-six of 202 work days in the 2011-2012 school year. (Doc. No. 31-4 at 3, 25-26.)

Early in that school year — on Sept. 6, 2011 — Plaintiff filed a Charge of Discrimination with the Texas Workforce Commission Civil Rights Division and the EEOC ("EEOC Charge"), alleging retaliation and sex and age discrimination. (Doc. No. 31-5 at 5.) She amended her EEOC Charge on Nov. 2, 2011 to include also claims of race and color discrimination. (*Id.* at 4.) TSU responded in writing to the initial EEOC Charge, denying any wrongdoing and explaining that Plaintiff had been demoted because of "a number of financial/business related issues within the college." (Doc. No. 35 at 18.) In addition to the previously outlined concerns, TSU noted that Ms. Poats had recently discovered several donor checks in the CBA files, dating back to Ms. Taylor's tenure, which had not been deposited. (Doc. No. 35 at 18.) Ms. Taylor was issued an EEOC Notice of Right to Sue on March 30, 2012. (Doc. No. 31-5 at 2-3.)

Plaintiff was ultimately terminated on June 19, 2012. (Doc. No. 31-2 at 20.) TSU's Notice of Termination stated that Plaintiff was being terminated "due to excessive/chronic absenteeism and [her] failure to submit requested medical documentation/certificate." (Doc. No. 31-4 at 31.) Plaintiff filed suit in this Court in June 2012 and amended her complaint in January 2013. (Doc. No. 1; Doc. No. 10.)

Plaintiff's First Amended Complaint alleged that TSU's employment decisions constituted improper age, race, and gender discrimination and retaliation in violation of numerous laws. Those included (i) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (ii) the Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code Chapter 21; (iii) the Texas Whistleblower Act, Texas Government Code Chapter 554; and (iv) FMLA, 29 U.S.C. §2601 *et seq*. (*Id.* ¶¶ 3-6, 43-53.) In its Memorandum & Order dated June 20, 2013, the Court dismissed Plaintiff's claims under the TCHRA, the Texas Whistleblower Act, and the FMLA. (Doc. No. 30.) It also dismissed Plaintiff's age discrimination claim arising under federal law. (*Id.*) On July 22, TSU moved for summary judgment on all remaining claims. (Doc. No. 31.) The Court heard argument on Sept. 10, at which time it gave both parties seven additional days to submit supporting documentation.

## II. LEGAL STANDARD

To grant summary judgment, the Court must find that the pleadings and evidence show that no genuine issue of material fact exists, and therefore the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

Factual controversies should be resolved in favor of the nonmoving party. *Liquid Air Corp.*, 37 F.3d at 1075. However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Id.* at 1076 (internal quotations omitted). Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Services, LLC*, 341 F. App'x 26, 28 (5th Cir. 2009) (citation omitted). The Court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075. As the Supreme Court has noted, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. ANALYSIS

TSU's motion distinguishes between claims arising out of Plaintiff's demotion and claims arising out of her termination. At the outset, it is unclear whether Plaintiff has even pleaded claims stemming from her termination. Plaintiff's complaint lists several ways in which she believes TSU retaliated against her, but does not include her termination. (*See* Doc. No. 10, ¶¶ 48-53). With respect to her claims of race, gender, and age discrimination, she pleaded that "defendant's conduct" violates Title VII, and because the Complaint's description of defendant's conduct includes terminating Plaintiff, the Court will assume, as TSU does, that Plaintiff's Title VII discrimination claims arise, at least in part, out of her termination. TSU argues that Plaintiff has failed

to exhaust those claims. (Doc. No. 31 at 12.) In order to be precise in its discussion of TSU's actions, the Court first resolves whether procedural requirements dictate that it focus only on Ms. Taylor's demotion and not pass on Ms. Taylor's termination.

### A. Claims Arising Out of Termination

TSU moves for summary judgment on claims arising out of plaintiff's termination on the grounds that she failed to exhaust administrative remedies. "Employment discrimination plaintiffs must exhaust administrative remedies before pursuing claims in federal court. Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002) (citing *Dao v. Auchan Hypermarket,* 96 F.3d 787, 788-89 (5th Cir. 1996)). Plaintiffs must exhaust each alleged Title VII violation; the Supreme Court has held that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). As such, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113.

Plaintiff's 2011 demotion and 2012 termination were quite clearly separate and distinct acts. As such, each required its own EEOC Charge. And yet, the EEOC Charge that Plaintiff has brought to the Court's attention was filed, and amended, well before Plaintiff was terminated. (Doc. No. 31-5 at 4-5.) Because Plaintiff cannot point the Court to any EEOC documentation relating to her termination, the Court must grant defendant's motion for summary judgment as to claims arising out of Plaintiff's

8

termination.[4]  *Cf. Simmons-Myers v. Caesars Entm't Corp.,* 515 F. App'x 269, 273 (5th Cir. 2013) ("Although Simmons-Myers made allegations of gender discrimination for acts prior to her termination in her EEOC charge, discrete discriminatory acts are not entitled to the shelter of the continuing violation doctrine. . . . Her termination was a separate employment event for which Simmons-Myers was required to file a

---

[4] Plaintiff does not argue that she was terminated in retaliation for filing a complaint with the EEOC. Had she done so, Title VII's exhaustion requirement would not prevent the Court from considering that claim. The Fifth Circuit has held "that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge." *Gupta v. E. Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981). While the continuing vitality of the *Gupta* exception has been called into question, *see Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 273 n.1 (5th Cir. 2013) ("We note that *Gupta* may no longer be applicable after the Supreme Court's decision in [*Morgan*, 536 U.S. 101]."), for now it remains the law of the Circuit that a claim alleging retaliation for the filing of an earlier EEOC charge need not be separately exhausted.

Thus, the Court would proceed to analyzing whether Plaintiff had made out a *prima facie* case. To establish a *prima facie* case of retaliation under Title VII, Taylor must show that "(1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the materially adverse action." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008). With respect to that first prong, filing an EEOC Charge is unquestionably protected activity. *See Richardson v. Prairie Opportunity, Inc.*, 470 F. App'x 282, 286 (5th Cir. 2012). Likewise, there is little doubt that termination constitutes an adverse employment action. *Id.* The key question before the Court, then, would be whether Plaintiff could show a causal connection between her August 2011 EEOC charge and her June 2012 termination.

The Fifth Circuit has explained that "at the prima facie stage, 'the standard for satisfying the causation element is much less stringent than a but for causation standard.' . . . [but] plaintiff must produce *some* evidence of a causal link between the protected activity and the adverse employment action to establish a prima facie case of retaliation." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (quoting *Fierros v. Texas Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001)). As such, "a plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (internal citation and quotation marks omitted). "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Id.* (quoting *Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997))." A lapse "of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Id.* (citing *Weeks v. NationsBank, N.A.*, CIV.A. 3:98-CV-1352M, 2000 WL 341257 (N.D. Tex. Mar. 30, 2000)). On the other hand, the Fifth Circuit has held on numerous occasions that a gap of more than seven months is insufficient on its own to give rise to an "inference of a causal link." *Gibson v. Verizon Servs. Org., Inc.*, 498 F. App'x 391, 397 (5th Cir. 2012); *see also Harvey v. Stringer*, 113 F. App'x 629, 631 (5th Cir. 2004) ("This Court has never held that a 10-month time lapse, on its own, is sufficient to satisfy the causal connection for summary judgment purposes.").

Here, Plaintiff filed her EEOC charge on Aug. 29, 2011. (Doc. No. 31-5 at 5.) She amended that complaint on Nov. 2, 2011. (*Id*. at 4.) She was presented with a Notice of Termination of Employment on June 19, 2012. (Doc. No. 31-2 at 20.) Thus, even if the Court were to rely on the date of amendment rather than the date of the initial EEOC filing, a solid seven-and-a-half months elapsed between the protected activity and the adverse employment act. More evidence would be necessary to establish a causal link and Plaintiff has not brought forth any. As such, the Court would grant summary judgment in favor of TSU.

9

supplemental claim, or at the very least, amend her original EEOC charge." (internal citations omitted)).

### B. Claims Arising Out of Demotion

Plaintiff claims race and gender discrimination, as well as retaliation, in violation of Title VII and age discrimination under Texas state law.  The Court also addresses Title VII color discrimination.

#### 1. Gender Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee based on the individual's gender.  Intentional discrimination can be proven by either direct or circumstantial evidence.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  If the Title VII claims lack direct evidence of discrimination, they will be analyzed according to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under the *McDonnell* framework, the plaintiff must first establish a *prima facie* case of discrimination.  *Id.* at 802.  To meet this burden, the plaintiff must show that she "1) is a member of a protected class; 2) was qualified for her position; 3) was subjected to an adverse employment action; and 4) was replaced by someone outside the protected class, or that other similarly situated persons were treated more favorably."  *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005).

If the plaintiff succeeds in making the *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its treatment of plaintiff.  *Id*.  If the defendant offers a nondiscriminatory reason, the burden shifts back

to the plaintiff to show that the employer's reason for the disparate treatment is merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000).

Because Plaintiff was replaced by a man, TSU does not dispute that Plaintiff has laid out a *prima facie* case of gender discrimination. The burden therefore shifts to TSU to show a nondiscriminatory basis for its treatment of Plaintiff. "The burden on the employer 'is one of production, not persuasion; it can involve no credibility assessment.'" *Bright v. GB Bioscience Inc.*, 305 F. App'x 197, 202 (5th Cir. 2008) (quoting *Reeves,* 530 U.S. at 142). "To meet this burden, the employer must show, through admissible evidence, a legally sufficient reason" for its treatment of Plaintiff. *Id.* Defendant relies upon an April 2011 letter from Ms. Poats to Plaintiff outlining a series of concerns with Ms. Taylor's performance, including late payments of invoice, failure to ensure that certain university employees were paid, improper processing of travel documentation, and failure to ensure that departments received the supplies they ordered. (Doc. No. 31-4 at 2, 6.) Likewise, TSU points to an internal audit identifying financial risks and a report stating that the new College Business Administrator was put in place to rectify those problems. (Doc. No. 31-3 at 11-24.) This evidence is more than sufficient to shift the burden back to the Plaintiff to show that TSU's purported non-discriminatory basis for Plaintiff's termination amounts to pretext.

A plaintiff may show pretext by "providing evidence that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Bright*, 305 F. App'x at 202 (citing *Reeves*, 530 U.S. at 143; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). With respect to the

11

latter, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147. Thus, "plaintiff may avoid summary judgment if [s]he creates a genuine dispute on the truth of the employer's proffered reasons for termination." *Richardson v. Prairie Opportunity, Inc.*, 470 F. App'x 282, 286 (5th Cir. 2012) (citing *Septimus*, 399 F.3d at 610).

Plaintiff appears to contend that TSU's stated reason for demoting her lacks credibility. But the evidence Plaintiff has brought forward does not support that claim. First, she points to an affidavit from former Dean Cummings. (Doc. No. 38-3.) Mr. Cummings speaks highly of Plaintiff's performance at work and notes that "my performance evaluations of Plaintiff speak for themselves." (*Id.* at 1.) He opines that her "demotion and eventual termination could not have been based on her work performance in any way." (*Id.*) He notes that as early as December 2010, Plaintiff reported the filing of inaccurate time sheets and that other employees grew hostile to Ms. Taylor. (*Id.* at 2.) He also explains that he found it unusual that Ms. Taylor was replaced by Mr. Wilson, despite the fact that he was not hired from within the College of Education, which had generally been required. (*Id.*) Mr. Cummings addresses the reports that Ms. Taylor had failed to timely turn in paperwork related to the hiring of new employees. (*Id.*) He explains that other departments and bureaucratic processes were also at least in part responsible but that Ms. Taylor took the blame. *Id.*

Second, and related, Ms. Taylor points to her positive performance reviews. She provides one review from 2008-2009 to complement Mr. Cummings' summary of his reviews. (Doc. No. 35 at 26.) Third, Ms. Taylor asserts that a meeting which defendant claims took place on April 4, 2011 never actually happened. (*See* Doc. No. 38 at 14.) Fourth, Plaintiff asserts that the auditor was told not to tell her about the audit. (Doc. No. 35 at 13.) Fifth, Plaintiff points to an affidavit from a former TSU colleague, Billy Sellers. (Doc. No. 38-4.) Mr. Sellers says he witnessed Mr. Wilson behaving inappropriately toward a student, reported it to Ms. Poats, and was told that he was overreacting. He characterized this as "protection of [a] hand-picked employee." (*Id.* at 2.) Mr. Sellers also states that another TSU employee referred to Ms. Taylor as "that old lying Linda Taylor." (*Id.* at 1.) Finally, Plaintiff has countered TSU's characterizations of the problems faced by the College in her April 2011 letter. (Doc. No. 35 at 9.)

At bottom, Plaintiff is unable to cast credible doubt on TSU's stated basis for her termination. Most of Plaintiff's relevant summary judgment evidence goes to whether she was rightly blamed for the College's management problems. While the summary judgment evidence does establish that others may have been partly responsible for some of the problems with new employee paperwork — especially that related to new employee hiring paperwork — it does not cast doubt on the existence of those problems, nor suggest that Plaintiff played no role in them. Plaintiff's informal April 2011 written response to her demotion tends only to suggest that others deserve some of the blame. (Doc. No. 35 at 9.) So too Plaintiff's own deposition testimony. (Doc No. 40-1 at 7-12.) Perhaps, if the relevant question was whether TSU had fairly allocated blame for the problems with College of Education's finances, Plaintiff would have some chance of

13

success. But it is not. Rather, the relevant inquiry is whether defendant's "*perception* of [Plaintiff's] performance, accurate or not, was the real reason for her" demotion. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408-09 (5th Cir. 1999); *see also Lee v. Geithner*, 825 F. Supp. 2d 852, 856 (S.D. Tex. 2011) ("The Fifth Circuit has long held that an employer's belief that an employee's performance is inadequate, even if that belief is incorrect, is a legitimate, nondiscriminatory reason and cannot establish the existence of a pretext for discrimination." (citing *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir. 1995))).

Thus, setting aside the evidence that goes to whether Plaintiff was fairly held responsible for the College's problems, Plaintiff is left with three other general categories of evidence: evidence that Plaintiff had previously received positive performance reviews, evidence that Plaintiff was demoted because she reported her colleagues' wrongdoing and evidence relating to Mr. Wilson. With respect to the first, Plaintiff does establish that as late as 2008-2009, she received positive reviews, but that alone does not rebut TSU's claim that serious problems later arose in her department. This is in keeping with the Fifth Circuit's general tendency not to allow strong performance reviews by one supervisor to undercut the credibility of negative reviews by another. *See, e.g.*, *Franklin v. Boeing Co.*, 232 F. App'x 408, 411 (5th Cir. 2007) ("The independent assessment of a team leader regarding job performance does not raise an inference that [Plaintiff's] supervisor's assessment was pretextual; it is only indicative of varying experiences with [Plaintiff]."); *Myers v. Michelin N. Am., Inc.*, 208 F.3d 1007 (5th Cir. 2000) ("[T]he existence of positive comments concerning [Plaintiff's] job performance in his

14

evaluations does not call into question the credence of [Defendant's] proffered explanation.").

Second, as to Plaintiff reporting her colleagues' wrongdoing, Plaintiff might be her own worst enemy on this front. Even if the Court were to determine that Plaintiff had demonstrated that her reports, and not the management woes, motivated TSU to demote Plaintiff,[5] this case would begin to look like one of "[t]he 'rare' instances in which a showing of pretext is insufficient to establish discrimination" because "the record conclusively reveals some other, nondiscriminatory reason for the employer's decision." *Laxton v. Gap Inc.*, 333 F.3d 572, 578-79 (5th Cir. 2003). Here, that reason would be Ms. Taylor's reports regarding financial malfeasance. Finally, with respect to Mr. Wilson, TSU's treatment of Plaintiff's replacement is simply irrelevant; it does nothing to undercut the credibility of the University's stated basis for Plaintiff's demotion. In short, Plaintiff has failed to demonstrate TSU's basis for demoting Plaintiff is pretext. The Court therefore must grant TSU's motion with respect to this claim.

### 2. Race Discrimination

Title VII also prohibits discrimination on the basis on race. Absent direct evidence of discrimination, the Court resorts again to the *McDonnell* framework. Plaintiff is an African-American woman and thus a member of protected class. But so too is the individual who replaced her. (Doc. No. 31-5 at 4.) Plaintiff cannot, therefore, state a *prima facie* case of race discrimination. The Court must grant TSU's motion for summary judgment on this claim.

---

[5] To be clear, Plaintiff has not shown that it was her complaints that led to her demotion. For starters, TSU stated that in its correspondence with the EEOC that Ms. Poats did not even know of Plaintiff's reports when Plaintiff was initially demoted. (Doc. No. 35 at 24.) Plaintiff has failed to rebut this evidence.

### 3. Color Discrimination

Ms. Taylor's complaint does not allege discrimination on the basis of color. Her Amended EEOC Charge did, though, and that would appear to be the more relevant claim, given that she alleges that she was replaced by a darker-skinned African American. Color discrimination is expressly recognized by the statute, *see* 42 U.S.C. § 2000e-2, yet there is hardly any Fifth Circuit case law on point. Courts outside this Circuit that have considered claims of color discrimination have generally held that "[c]olor discrimination arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual." *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 132 n.5 (4th Cir. 2002); *see also Williams v. Wendler*, 530 F.3d 584, 587 (7th Cir. 2008) ("Light-skinned blacks sometimes discriminate against dark-skinned blacks, and vice versa, and either form of discrimination is literally color discrimination."); *Simmons-Blount v. Guilford Cnty. Bd. of Educ.*, 1:06-CV-944, 2009 WL 962266, at *6 n.4 (M.D.N.C. Apr. 7, 2009) ("Discrimination can be based on race if different races are involved, or on color if members of the same race are involved, but not both."); *Govia v. Century 21, Inc.*, 140 F. Supp. 2d 323, 324 (S.D.N.Y. 2001) (finding plaintiff's allegation that "defendant gave promotional preference to whites and 'lighter skinned' minorities, while discriminating against him and other 'darker skinned' minorities on the basis of color" sufficient to state a claim for Title VII employment discrimination).

For the Court to consider such a claim at this late stage of proceedings would require that Plaintiff amend her Complaint, and Plaintiff has not made any showing that

she could satisfy Rule 16(b)'s "good cause" standard. Even if the Court were to consider the substance of color discrimination claim, however, it would grant summary judgment to TSU. Looking to the *McDonnell* framework, case law does not provide easy answers to the question of what exactly constitutes a "protected class" in the context of color discrimination, or even if that concept is relevant in this context. But there is no dispute in the summary judgment evidence that Plaintiff is a light-skinned African American and the individual who replaced her was a dark-skinned African American. (Doc. No. 31-5 at 4.) As such, the Court could assume, *arguendo*, that the first and fourth elements of a *prima facie* case under *McDonnell* are satisfied. TSU appears not to contest that Plaintiff was qualified for the position or that she was demoted, and that a demotion constitutes an adverse employment action.[6] As such, Plaintiff would be able to state a *prima facie* case of color discrimination.

The analysis would then proceed just as it did above, under gender discrimination, and Plaintiff's claim ultimately would fail because she has not put forward evidence of pretext.

### 4. Retaliation

Title VII "does not protect opposition to all forms of unscrupulous conduct." *Brown v. United Parcel Serv., Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010). Rather, Title VII protects only opposition to discrimination based on "race, color, religion, sex, or national origin." *Id.* (citing 42 U.S.C. § 2000e–2(a)(1)). Thus, for the purposes of a retaliation claim, "[p]rotected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in

---

[6] TSU makes these concessions in the context of Plaintiff's claim of gender discrimination, but her qualifications for the job and whether defendant took adverse employment actions would not change depending on the specific discrimination at stake.

any investigation, proceeding, or hearing under Title VII." *Ackel*, 339 F.3d at 385 (*citing Green v. Administrators of the Tulane Educational Fund*, 284 F.3d 642, 657 (5th Cir. 2002)). In short, unless Plaintiff can show that she was "opposing discrimination directed against the plaintiff or third parties," she cannot prevail on her retaliation claim. 1 Rothstein et. al, Employment Law § 2.11 (4th ed. 2013).

Plaintiff makes abundantly clear that she believes she was retaliated against for reporting colleagues for filing falsified time sheets and committing other finance-related wrong. Plaintiff's claim founders, therefore, because she fails to allege that she was retaliated against for engaging in conduct protected by Title VII. She does not allege — or provide evidence suggesting — that she was retaliated against for claiming discrimination. Nor is there is evidence to suggest that the falsified time sheets and wrongful payments were a part of a larger scheme of discrimination that would violate Title VII. Consequently, on Plaintiff's claim of retaliation, the Court must grant TSU's Motion for Summary Judgment. It is entirely possible that Plaintiff faced retaliation in the colloquial sense of the word, but the summary judgment evidence does not support the claim that she faced retaliation in a manner that violates Title VII.

### 5. Age Discrimination

In its earlier Memorandum & Order, the Court noted that "a state age discrimination claim would likely be foreclosed because Texas has not waived sovereign immunity regarding claims under the TCHRA in federal courts." (Doc. No. 30 at 10-11.) The Court did not dismiss plaintiff's state-law age discrimination claim at that time, however, because TSU had not requested that it do so. Because Defendant now so moves, the Court dismisses Plaintiff's state-law age discrimination claim. *See Hernandez*

*v. Texas Dep't of Human Servs.*, 91 F. App'x 934, 935 (5th Cir. 2004) ("The State of Texas has waived its sovereign immunity in state courts for TCHRA violations. . . . Texas' waiver of sovereign immunity in its own courts, however, is not a waiver of its Eleventh Amendment immunity in federal courts. . . . Indeed, the Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court." (internal citations omitted)); *see also Swanson v. R.R. Comm'n of Texas*, No. CIV.A. C-11-80, 2011 WL 2039601, at *5 (S.D. Tex. May 24, 2011) ("As Defendant is a state agency, it is entitled to sovereign immunity in federal court for [age discrimination] claims brought under the TCHRA.").

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**. The case is dismissed with prejudice.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this 25th day of September, 2013.

**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**